IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 12, 2022 Session

**STATE OF TENNESSEE v. ALAIN BENITEZ**

**Appeal from the Criminal Court for Smith County**
**No. 2019-CR-134    Brody N. Kane, Judge**

_____

**No. M2021-00073-CCA-R3-CD**

_____

Defendant, Alain Benitez, appeals his convictions for two counts of first degree felony murder and two counts of robbery, for which he received an effective sentence of two consecutive life sentences.  Defendant contends that: (1) the evidence presented at trial is insufficient to support his convictions; (2) the trial court erred by admitting into evidence messages sent between Defendant and his girlfriend through Facebook Messenger; (3) the trial court erred in admitting "forensic evidence"; and (4) the trial court abused its discretion by imposing consecutive sentences.  Upon review, we affirm Defendant's convictions but reverse the imposition of consecutive sentencing and remand to the trial court for a new sentencing hearing.  The new sentencing hearing is limited to consideration of the factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), to determine the propriety of consecutive sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part; Reversed in Part; and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Jeffrey N. Kuykendall, Nashville, Tennessee, for the appellant, Alain Benitez.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Tommy Thompson, District Attorney General; and Jason Lawson and Jack Bare, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

This appeal arises from the shooting deaths of two men, Shannon Smith and Devon Clark, in Pleasant Shade on April 25, 2018. Following an investigation by the Tennessee Bureau of Investigation (TBI) and local law enforcement, the Smith County Grand Jury issued an indictment charging Defendant with two counts of first degree felony murder during the perpetration of a robbery and two counts of robbery.[1]

*Trial*

At trial, Jacqueline Brinkley testified that she was the mother of Mr. Clark's children and that she was Mr. Smith's cousin. Ms. Brinkley explained that, before his death, Mr. Clark drove a white Dodge Charger. She recalled that, on April 25, 2018, Mr. Clark told her that he and Mr. Smith had to "pick[] up money from somebody" and that they left her home in Murfreesboro around 3:00 p.m. She said that she tried to call Mr. Clark around 6:00 p.m. that evening but received no answer.

Brandy Brown testified that she and Mr. Smith had been dating for eleven years and shared one child together at the time of his death. Ms. Brown recalled a time when a man named David Bibian came to their home to purchase chickens from Mr. Smith. Ms. Brown recalled that Mr. Bibian drove a white utility van and that he owned a remodeling business. She said that she knew Mr. Smith was "associated with drugs" but that she told him drugs were "not to be around" her or their young child. Ms. Brown said that she last spoke to Mr. Smith around 5:00 p.m. on April 25, 2018, and that he told her he was with Mr. Clark.

Deputy Josh Williams of the Smith County Sheriff's Office (SCSO) testified that, on April 25, 2018, he responded to an abandoned house on Dillehay Hollow Road to investigate a suspicious white vehicle at the location. Deputy Williams arrived at the house, located in Pleasant Shade in a rural part of Smith County, a little after 6:30 p.m. Deputy Williams saw an unoccupied white Dodge Charger sitting in the driveway. As Deputy Williams approached the house, he saw a Black male, later determined to be Mr. Smith, lying face down in the yard. After calling out to Mr. Smith and receiving no response, Deputy Williams realized that Mr. Smith had a gunshot wound to his head. Deputy Williams then observed a second Black male, later identified as Mr. Clark, lying on his back on the steps of a shed behind the house. Mr. Clark was also unresponsive. Deputy Williams called for backup and then assisted in securing the scene.

---

[1] Defendant's alleged accomplice, David Bibian, was charged in a separate indictment.

- 2 -

Dr. David Zimmerman testified that he was a forensic pathologist working with the Medical Examiner's Office in Nashville. Dr. Zimmerman stated that he performed autopsies on both victims. Dr. Zimmerman explained that Mr. Smith suffered an intermediate range gunshot wound to the head and that he was able to recover fragments of the bullet from Mr. Smith. He opined that Mr. Smith's cause of death was a gunshot wound to the head and that the manner of death was homicide. Regarding Mr. Clark's autopsy, Dr. Zimmerman stated that Mr. Clark's cause of death was an "indeterminate range perforating gunshot wound of the neck" and that the manner of death was homicide. Dr. Zimmerman stated that no bullet or bullet fragments were recovered from Mr. Clark.

TBI Special Agent Steven Kennard testified that he attended the victims' autopsies. Agent Kennard said that the medical examiner collected nail clippings from both victims, a hair from the left hand of Mr. Smith, and bullet fragments from Mr. Smith's body. Agent Kennard then turned these items over to the crime lab.

TBI Special Agent Luke Webb testified that he responded to the crime scene on Dillehay Hollow Road. When he arrived, Agent Webb made a diagram of the crime scene and photographed two tire tracks, which he believed were of possible evidentiary value. Agent Webb collected a Newport cigarette butt and a .40 caliber shell casing located near Mr. Smith's body. Agent Webb found a cell phone in Mr. Smith's pocket. On the phone, Agent Webb saw a text message from a contact titled "David New" that read, "[F]ive minutes to get there." Agent Webb explained that neither Mr. Smith nor Mr. Clark had any cocaine with them but that investigators found cash on both men. Mr. Clark also had a fully loaded pistol in his waistband. Agent Webb stated that the white Dodge Charger was taken to the TBI crime laboratory in Nashville for processing. Agent Webb returned to the crime scene the following day to search the area in the daylight. He collected eight fired .45 auto cartridge casings on the side of the house but noted that they looked "older." Agent Webb collected another Newport cigarette butt closer to the road.

Agent Webb testified that, during the subsequent investigation, he spoke to Roy Boyd, Jr., Defendant's roommate. Based on his conversation with Mr. Boyd, Agent Webb executed search warrants at Misty Shaddocks' residence on Faith Lane where Mr. Boyd, Ms. Shaddocks, and Defendant lived and a second search warrant at Mr. Bibian's home on Maynard Hollow Road. Agent Webb searched Defendant's room at Ms. Shaddocks' residence and collected a cigarette butt and a pack of Newport cigarettes.

During the search of Mr. Bibian's home, Agent Webb found a magazine for a .40 caliber Glock. Agent Webb noted that the bullets inside the magazine were the same brand as the .40 caliber shell casing found at the crime scene. He found and collected additional .40 caliber bullets in an "ammo can." Agent Webb photographed a white Ford E-250 van at Mr. Bibian's home. Inside the van, Agent Webb found a package of Newport cigarettes

and a Walmart receipt showing purchase of a cell phone on April 26, the day after the murders.

On cross-examination, Agent Webb agreed that Mr. Clark had almost over $1400 in cash on him at the time of his death. He further agreed that the tire tracks found at the crime scene were not linked to Defendant's car, a red Nissan Altima. Agent Webb acknowledged that they found no hair belonging to Defendant at the crime scene. He said that he was unaware of any DNA matches between Defendant and the cigarette butts collected at the scene. The following exchange then occurred:

> [DEFENSE COUNSEL]: So just to recap, I know you've done an exhaustive search of the area. You are not prepared to testify today of any DNA evidence or physical evidence linking that scene to my client, is that correct?
>
> [AGENT WEBB]: If any exists, I don't know of it.

TBI Special Agent James Scarbro testified that he was certified in Cellebrite technology, a software used to analyze cell phones and produce reports. He said that he used the software on Mr. Smith's cell phone and produced a report that was entered into evidence. He testified that Mr. Smith received a text message from Mr. Bibian's cell phone on April 25, 2018, at 11:46 a.m. that said, "Everything's still all good, right?" Mr. Bibian then responded with a text message that instructed Mr. Smith to call him. Agent Scarbro explained that there were then multiple phone calls between Mr. Bibian and Mr. Smith of various durations. At 5:09 p.m., Mr. Smith received a final text message from Mr. Bibian that said, "Five minutes to get there."

Agent Scarbro testified that he went to Discount Tire Store in Lebanon after learning that Mr. Bibian had changed the tires on his white Ford van the day after the murders. Agent Scarbro obtained a receipt from the tire store dated April 26, 2018, that showed Mr. Bibian's purchase of four tires for the van. Agent Scarbro testified, however, that the TBI did not recover the van from Mr. Bibian's residence until May 3, 2018.

TBI Special Agent Rielly Gray testified that she went to Walmart in Lebanon after a Walmart receipt was found during the search of Mr. Bibian's white Ford van. Based on the date and time stamp on the receipt, she recovered video surveillance footage from Walmart from April 26, 2018, which showed Mr. Bibian purchasing a new cell phone.

Clifton Avent testified that he was an inmate in the Wilson County Jail because of a probation violation. Mr. Avent stated that he first met Defendant when Mr. Avent was working for Mr. Bibian at a "housing unit," where he and Mr. Bibian were remodeling the

building and converting it into apartments. Mr. Avent recalled that, while he was waiting for Mr. Bibian to arrive at the job site one day, Defendant pulled up in the parking lot. Mr. Avent approached Defendant's car and saw that Defendant was holding a cell phone in his hand. Mr. Avent read on the phone that two men had been found dead in an abandoned house. Mr. Avent testified that he asked Defendant, "[W]ho did that?" Defendant responded, "I did." Mr. Avent testified that he did not ask Defendant anything else about what he saw on the phone.

On cross-examination, Mr. Avent testified that he voluntarily gave a statement to the TBI about his interaction with Defendant. Mr. Avent agreed he told investigators that, sometime before the murders, he saw Mr. Bibian speaking to Mr. Smith and Mr. Clark about a date for picking up or dropping off drugs. Mr. Avent said that Mr. Bibian always carried a gun because "he was in an environment where a lot of criminal activity took place . . . as far as construction work" and did not want to be a victim of a robbery.

Roy Boyd, Jr., testified that he first met Defendant when Mr. Boyd moved in with his friend, Ms. Shaddocks, in Smith County. He said that Defendant was also staying at Ms. Shaddocks' residence. Mr. Boyd stated that, prior to the murder, Defendant had been in a dispute with Mr. Bibian but that, about a week or so before the murders, Defendant and Mr. Bibian met several times. Mr. Boyd testified that, after the third meeting with Mr. Bibian, Defendant told Mr. Boyd that he and Mr. Bibian "had worked their problems out" and that Defendant was going to "do a lick" for Mr. Bibian. Mr. Boyd explained that his understanding of the meaning of the work "lick" in that context was that Defendant was going to commit a robbery. Mr. Boyd stated that Mr. Bibian had a cocaine habit and that Mr. Bibian provided him with methamphetamine about once a week.

Mr. Boyd testified that, a few days after this conversation, he left Ms. Shaddocks' residence and went to Nashville. The next day, Ms. Shaddocks called Mr. Boyd and told him that she had been in a car wreck and was injured and needed his help. Ms. Shaddocks also told Mr. Boyd that, after he left her residence, Defendant came in, threw a bag of money on her bed, and told her that he would be back. Mr. Boyd testified that, when he returned to Ms. Shaddocks' residence, Defendant was not there but that Ms. Shaddocks' son, Jonathan Binkley, was there. Ms. Shaddocks called Mr. Boyd into her bedroom and showed him a picture on her phone "where two people had been murdered and the bodies had been dumped[.]" Ms. Shaddocks told Mr. Boyd that she thought that her son and Defendant had been involved in the murders. Mr. Boyd explained that Defendant and Mr. Binkley were good friends. Mr. Boyd testified:

> I asked [Ms. Shaddocks] could I use the phone, and I don't know why, I just had a real uneasy feeling about everything, just sort of her behavior in general. When I looked on her phone, I [saw] some messages between her

and [Defendant] and between her and her son, [Mr. Binkley]. It made me really uncomfortable, and I forwarded them to my phone.

Mr. Boyd said that, a few hours later, when it was "getting dark[,]" he was in the bathroom at Ms. Shaddocks' residence when Defendant and Defendant's friend, Blake, entered the home. Mr. Boyd stated, "I had the bathroom door open so as soon as they walked in, I could see them, they could see me, and [Defendant] came walking down the hallway towards me." Mr. Boyd said that he felt "[v]ery uncomfortable" because Defendant had a pearl handled pistol in his waistband that he began "brandishing."

Mr. Boyd testified:

[W]e went to the adjacent bedroom and we were getting high. We[] smoked a blunt together, a marijuana cigarette, and [Defendant] showed me on his phone, the same picture that [Ms. Shaddocks] showed me except that [Defendant] had cropped out the title above and just had the actual photos of the two deceased bodies.

Defendant then told Mr. Boyd that he was responsible for the murders of Mr. Smith and Mr. Clark. Mr. Boyd stated:

[Defendant] motioned with his hand, made like a gun figure with his hand, and he had motioned how he had shot them, and then he kind of sat back and as if he was reliving it again. He kind of did it again, the motion, you know, and made two gun shots with his hand.

Defendant said that Mr. Bibian had been "too scared" and "too much of a coward to do it, so [Defendant] did it." Mr. Boyd said that he believed Defendant and that Defendant was not "joking around." Mr. Boyd continued:

The night turned pretty bad pretty quick. Blake had come into the room and he was really scared. I mean, the boy was so scared he was shaking, couldn't hardly talk he was so scared, and he kept looking down at the floor. And I had asked him because I didn't see – Blake's always got his car everywhere he goes, and when they pulled up I seen them both together in [Defendant's] car, and Blake didn't have his car.

So I said, where's your car at, and he didn't answer me. [Defendant] spoke up and said, hey . . . say something, tell him. He's talking to you dumba**. And Blake was -- he was scared. He was scared to death, and he

looked up at me and told me he didn't have his car anymore. He never told me why.

Mr. Boyd testified that Defendant told Mr. Boyd that he had gotten some damage to his red Nissan Altima repaired and that he had purchased new rims for the car. Defendant asked Mr. Boyd if he wanted to go outside and look at the car. Mr. Boyd testified that he felt uncomfortable at the suggestion because he noticed a flashlight in the adjacent field that kept blinking on and off. Mr. Boyd said that, despite his reluctance, he accompanied Defendant outside where Defendant attempted to lure him to the side of the residence. Mr. Boyd stated that Defendant "was like . . . come over here and look, and he put his hand on his pistol as he was about to draw his pistol." Mr. Boyd testified that he felt like Defendant "was going to silence [him]." Mr. Boyd ran back inside the residence through the front door and closed the door behind him; Defendant ran around the house and entered through the back door.

Mr. Boyd testified that, once inside the residence, he stood beside Ms. Shaddocks' eleven-year-old son, Mikey. Mr. Boyd stated that he felt safer standing beside Mikey because Defendant loved Mikey. The following exchange then occurred:

> [STATE]: So you felt like being next to Mikey would give you a better chance?
>
> [MR. BOYD]: I'm absolutely positive that if Mikey had not been there, I would not be here.
>
> [STATE]: And what do you think would have happened?
>
> [MR. BOYD]: I think I would have met the same fate as [Mr. Smith and Mr. Clark].

Mr. Boyd testified that, while inside the residence, Defendant said, "I'll do it, I'll f**king do it right here." Mr. Boyd said that he believed Defendant was talking about killing him. He said that Ms. Shaddocks looked at Blake and "shook her head like, no" and that Defendant then called Blake into the back bedroom. Mr. Boyd said that he took this opportunity to run back out the front door and into the woods. Mr. Boyd stated:

> I started running across that and as I was running across I s[aw] another fence in the distance and it was full with weeds and trees and I didn't see any way to get through but a small opening and so as I was running, I ran towards that opening and I dove through and ended up in a person's driveway.

Mr. Boyd said that, when he stood up and looked behind him, he saw that Defendant had pursued him into the field that Mr. Boyd had just crossed. Mr. Boyd knocked on the door of the neighbor's house and asked to be let in. An older woman allowed him inside, and he informed her that he was being "pursued by somebody who would have no problem . . . harming us[.]" The woman then loaded a shotgun, gave it to Mr. Boyd, and called the police. Mr. Boyd told the police that he was being pursued "by the same man who murdered the people . . . a few nights before."

When law enforcement arrived, Mr. Boyd was taken to the Smith County Jail on an outstanding warrant for a probation violation. Mr. Boyd gave a statement to the TBI and allowed access to his cell phone. He also provided the TBI with Mr. Bibian's and Defendant's cell phone numbers. Mr. Boyd stated that, after the murders, Defendant was acting "cocky" and told Mr. Boyd that he was "laying low." Mr. Boyd recalled that Defendant spent money on fixing up his car and that he wore brand new clothes at Ms. Shaddocks' residence.

Mr. Boyd recalled a time when he was riding in Defendant's car and Defendant called Mr. Bibian and threatened Mr. Bibian because of a dispute they had about Defendant's dog. Defendant told Mr. Bibian that "if he didn't get the dog out [of the pound] that [Defendant] would f-ing kill him." Mr. Boyd testified that, while he was in jail, he had other inmates tell him that they had been asked about where Mr. Boyd and his family lived. Due to these conversations, Mr. Boyd contacted the TBI and spoke to them again.

Deputy Dustin Harvey of the Wilson County Sheriff's Office (WCSO) testified that he was on patrol on May 2, 2018, when the TBI requested his assistance in conducting a traffic stop of Defendant, who had an outstanding warrant for aggravated assault. Deputy Harvey was informed that Defendant was driving a red Nissan Altima. When Deputy Harvey saw a car matching that description on Carthage Highway heading towards Lebanon, he attempted to initiate a traffic stop. However, the driver "instantly took off at a high rate of speed, attempted to pass [a] TBI agent, at which point they struck each other." Deputy Harvey eventually lost sight of the red Nissan Altima "due to the high rate of speed and traffic." Deputy Harvey testified that they reached speeds of over 120 miles per hour during the chase and that the driver eventually lost control of the car in a curve and ended up in the front yard of a house. The car was unoccupied when Deputy Harvey caught up to it, and Defendant was not apprehended that night. Investigators found a .45 caliber cartridge case in the driver's seat. They later determined that the red Nissan Altima was owned by Defendant's cousin, Adrian Ramirez, and that Mr. Bibian's address was listed on its registration. The dash-cam video of the chase from Deputy Harvey's patrol car was introduced as an exhibit.

WCSO Detective Jennifer Edwards testified that, on May 3, 2018, she responded to a residence on Carthage Highway after a possible sighting of Defendant. Detective Edwards met with an elderly lady who reported that a man was outside of her residence attempting to "get in[.]" Detective Edwards searched the area of the residence but found no one. She was then alerted to a "male running through the woods up the hill towards" a neighboring house. Detective Edwards said that Defendant was eventually located inside the neighboring house and taken into custody.

Agent Scarbro was recalled and testified that he interviewed Defendant on May 3, 2018, after Defendant's arrest. After being read his *Miranda* rights, Defendant signed a waiver of rights form and agreed to speak with Agent Scarbro. Agent Scarbro told Defendant that they wanted to speak to him about the deaths of two men in Pleasant Shade. Although Defendant initially denied knowing anything about the murders, he eventually provided Agent Scarbro with a written statement, which Agent Scarbro read into the record.

Defendant told Agent Scarbro that his car was a red Nissan Altima and that he knew Mr. Bibian and did remodeling work for him. Defendant admitted that he sold marijuana and that Mr. Bibian was "into cocaine." Defendant said that, about three weeks prior, Mr. Bibian introduced him to Mr. Smith and Mr. Clark and told Defendant that the two Black men sold cocaine. Defendant stated:

> Last Wednesday I was with [Mr. Bibian]. We were in his white van. I was driving. Earlier that day he picked me up on Cedar Street. I left my car on Cedar Street. He said we were going to a house in Smith County to do some work. I knew there was going to be somebody coming out there to sell some cocaine because [Mr. Bibian] told me there was going to be somebody coming out there to sell cocaine.

Defendant said that they traveled to a house on Dillehay Hollow Road where no one lived. He stated, "When we got to the house I backed the van into the driveway up next to the house. I did that because that is where [Mr. Bibian] told me to park." Defendant continued:

> [Mr. Bibian] called somebody on the phone and they talked for a couple of minutes. I couldn't tell who he was talking to. [Mr. Bibian] was asking them where they were at. They were saying they were in . . . Defeated. We sat there in the van. About ten minutes later a white Dodge Charger pulled up. It had tinted windows so I couldn't tell who was in it.

> . . . .

They pulled up on the passenger's side of [Mr. Bibian's] van. [Mr. Bibian] got out of the van and told me to stay in the van. After [Mr. Bibian] got out I heard two, maybe three shots. It was quick after he got out. [Mr. Bibian] got back in the van with a backpack and told me to go. The backpack was like the size of a lunch box. It probably had a kilo of cocaine in it. I drove away. [Mr. Bibian] had a .40 Glock on him. He carries that all the time. I drove back to Cedar Street and that is where I got out. On the way back [Mr. Bibian] told me to take this to the grave.

. . . .

After those dudes were found dead at that house[,] my girlfriend sent me a screen shot of them two dudes that were dead and I saw that it was the same two dudes I met on Cedar Street a few weeks ago. She sent me the screen shot because those two dudes were found dead at the same house that me and [Mr. Bibian] had gone out to.

Defendant told Agent Scarbro that Mr. Bibian had a pearl handled gun. Defendant consented to providing a DNA sample and consented to a search of his car and cell phone. Agent Scarbro stated, however, that he was not able to access Defendant's phone because Defendant said that he did not remember the passcode to the phone.

Agent Scarbro testified that, on May 10, he conducted a second interview with Defendant after the TBI discovered a Colt .45 pistol that had been thrown out during the police chase. After being *Mirandized*, Defendant told Agent Scarbro, "The statement that I gave you the other day is true but I did not tell you everything." Defendant said:

I was at Cedar Street in Lebanon when [Mr. Bibian] picked me up on Wednesday, April 25th. I didn't see anybody that morning.

. . .

When [Mr. Bibian] got there we did a couple lines of cocaine. That's when [Mr. Bibian] told me that we were going to go do a job. That's when we left Cedar Street and headed towards Hartsville. [Mr. Bibian] was driving when we left Cedar Street. We stopped at a gas station in Hartsville to munch on something. I don't remember where we stopped or what I got to eat. [Mr. Bibian] was acting messed up so I drove the rest of the way from Hartsville to the abandoned house. [Mr. Bibian] gave me directions to the abandoned house.

. . . .

When [Mr. Bibian] got back into the van after I heard the shots, [Mr. Bibian] told me to ditch my phone. When [Mr. Bibian] got back in, he pulled two to three phones out of his pocket. Then [Mr. Bibian] pulled his .40 caliber Glock out of his pants. He pulled it from the small of his back. [Mr. Bibian] then laid the gun and the phones on the console of the van.

Defendant told Agent Scarbro:

When the police chased me down Highway 70, I tossed that .45 out of the window. That is the gun that [Mr. Bibian] gave to me. [Mr. Bibian] had just given me the gun the day before you all got me. [Mr. Bibian] gave it to me on Cedar Street because [Mr. Bibian] owed me a bunch of money. [Mr. Bibian] owed me a lot of money for the work that I had done. [Mr. Bibian] owed me around $5,000. Every gift that I got was from [Mr. Bibian] because he never paid me. The reason that I threw that gun out of the window was because I did not want to catch a gun charge.

Agent Scarbro testified that Defendant gave a third written statement to the TBI on June 29, 2018, after waiving his *Miranda* rights. Defendant told Agent Scarbro:

The day that [Mr. Bibian] and I were at Cedar Street in Lebanon, [Mr. Bibian] told me that there were some people that owed him money. This was the same day that we went out to Pleasant Shade. [Mr. Bibian] told me that he was going to kill them because they owed him money. When we got out to Pleasant Shade, [Mr. Bibian] told me to back the van up to the house and just wait in the van. When [Mr. Bibian] got back in the van after I heard the shots, [Mr. Bibian] told me that he'd killed them both. The two guys thought that they were coming out there to buy some cocaine off of [Mr. Bibian] but [Mr. Bibian] didn't have any cocaine. [Mr. Bibian] told me that it was a robbery.

Agent Scarbro testified that, as part of the investigation, he went to the house of Defendant's girlfriend, Anna Barrios, after speaking to Mr. Boyd. Agent Scarbro explained that he had been shown a photograph of a text message that Mr. Boyd's girlfriend received that had contained Mr. Boyd's written statement to the TBI. Agent Scarbro said that Ms. Barrios turned over letters and envelopes Defendant sent her from jail. Agent Scarbro explained that Defendant's letters contained a copy of the statement that Mr. Boyd gave the TBI and a copy of Mr. Avent's statement. Agent Scarbro said that he confronted Ms. Barrios about whether she had been instructed by Defendant to send out copies of the

statements to intimidate Mr. Boyd and Mr. Avent but that Ms. Barrios's mother got upset and asked him to leave. Agent Scarbro said that, when he later asked Defendant about sending Ms. Barrios copies of the witnesses' statements, Defendant denied instructing Ms. Barrios to publish the statements.

Agent Scarbro testified that, after Defendant's arrest, he monitored Defendant's jail phone calls. The State introduced a recording of Defendant's phone call from jail on November 9, 2018. During his conversation with someone, Defendant laughed about hiding in the woods for two nights after being chased by police. The State then introduced a recording of Defendant's jail phone call to Ms. Barrios on December 18, 2018. During the call, Defendant told Ms. Barrios that, "when [she] g[o]t the statement," she should "take a picture of it" and then "post it on Facebook," "tag Geno,"[2] and ask him, "[H]ow he gonna snitch on [his] own people to try to get outta trouble?"

At this point, in a jury-out hearing, the State sought to introduce evidence of messages sent from Defendant to Ms. Barrios through Facebook Messenger to show that Defendant knew that he was embarking on a dangerous "mission" before the murders, that Defendant spent large amounts of money immediately after the murders, and that he displayed consciousness of guilt following the murders. Defendant objected to the introduction of the messages, arguing that they were hearsay and that the business records affidavit from the records custodian at Facebook was inadequate to authenticate the messages. Regarding the time stamps on the messages, Defendant argued that there was no witness to testify to the meaning of "UTC" and that the trial court should not take judicial notice of the time difference between UTC and CT. The State responded that "courts across this country have let detectives testify about what UTC means because it's a time zone" and that courts "have actually declared judicial notice as to what UTC means[.]"[3]

At the conclusion of the hearing, the trial court overruled Defendant's objection. The trial court stated:

> I'm going to let the records in. I'm going to take judicial notice of UTC. This has come up on numerous cases. It is what it is as far as the time frame goes. I think the State did follow the proper steps.
>
> . . . .

---

[2] Mr. Boyd testified that his nickname was Geno.

[3] UTC stands for Universal Time Coordinated and is a 24-hour time standard used to synchronize world clocks. It is the successor to Greenwich Mean Time or GMT.

I find these are business records and are an exception to the hearsay rule.

Agent Scarbro then testified that he obtained Defendant's Facebook Messenger records through a search warrant for Defendant's Facebook account. Agent Scarbro stated that Facebook authenticated the records as coming from Defendant's account and identified a copy of the Certificate of Authenticity of Domestic Records of Regularly Conducted Activity, which was admitted as an exhibit to his testimony. In the affidavit, a Facebook records custodian certified that the messages were from the specific Facebook account requested by the warrant. The records from Facebook showed that the name on the targeted account was "Alain Benitez" and that most of the messages the State introduced were sent to or received from an account displaying the name "Ana Barrios." A few other messages were sent to or received from an account in the name of "Jonathon Binkley."

Regarding the contents of the exchanged messages, Agent Scarbro testified that, in one Facebook Messenger message sent to Ms. Barrios on April 25 at 1:18 p.m., Defendant told Ms. Barrios that he was with someone named David and that he was "[g]etting high like usual." At 3:39 p.m., Defendant sent Ms. Barrios a message that read, "Amor, Lord, forgive me." When Ms. Barrios asked if he was okay, Defendant responded, "Yes, baby, I'm okay but the way I get my money." At 4:39 p.m., Defendant sent Ms. Barrios a message that read, "Amor, I'm [about to] start on this mission. I love you so much. Always know that I'll text you when I'm done. Lord, take care of me." Ms. Barrios then messaged Defendant and told him to be careful. Defendant next contacted Ms. Barrios through Facebook Messenger at 6:19 p.m., and when she asked him if he was okay, Defendant said that he was but that he was "[a] little nervous." He then told her that he "needed a few minutes."

Agent Scarbro stated that, at 9:09 a.m. the following morning, Defendant messaged Ms. Barrios and told her that he was looking at some rims for his car, and he later told her that he purchased the rims for $1,400. Defendant told Ms. Barrios that he was going to "spoil her" too. While waiting at the tire shop, Defendant messaged Ms. Barrios and said, "Baby, I still can't believe." When Ms. Barrios asked him what he meant, Defendant responded, "What I did, baby." At 10:52 p.m. on April 26, Defendant messaged Ms. Barrios and told her that he had "smoked three blunts" and that he hoped it would numb him. On April 27 at 10:45 a.m., Defendant sent Ms. Barrios a message that read, "I almost flew [through] the money already, Baby. LOL."

Agent Scarbro stated that, on the night of April 30, Defendant sent Ms. Barrios a message that read, "I feel like an mf king monster." During the same exchange with Ms. Barrios, Defendant said, "Police is so hot, Amor. I can't leave." In additional messages, Defendant explained that he was smoking a blunt and said that he could "feel the weight

of the world." Defendant then sent a message to Ms. Barrios that read, "The only thing I can be now is what I am, but it's so hard to deal with all this and the f\*\*ked up part about that is that it f\*\*ks your head up." Agent Scarbro testified that the messages continued, as follows:

> [AGENT SCARBRO]: [Ms. Barrios] says, "I know you do have a lot on your mind. I wish there was something I could do for you but, Baby, you have to keep going. This life stops for nobody. It doesn't care, Baby. Like we just live to live struggle feel sad all that, Baby."

> [THE STATE]: And then what does [Defendant] respond?

> [AGENT SCARBRO]: " . . . I know, Baby, but it's just like I have no patience. Now everybody is just dumb af. I feel like I can do whatever I want now. This made me so cold."

> . . . .

> Then [Defendant] says, "This changed me." Then [Ms. Barrios] says, "I know it did, Baby. You know, Baby, I still think the same of you, no different." Then he responds, "Oh, Baby, I'm glad you do." Then he says, "Baby, people look at me so [differently] now. That's why I don't go out a lot no more. Makes me feel dark and lonely."

> Then he says, "I feel the weight of it, Baby, like it's on my shoulders. They are sore but it won't go away." Then he says, "I feel like [something is] pushing me down on my shoulders." She responds, "Yeah, Baby." Then [Defendant] says, "I'm not, Baby." And then he says, "Ima say f-it, Baby." Then [Ms. Barrios] says, "Well, Baby, good. I'm glad you're gonna be okay." Then he responds, "Yeah, Baby, but my dark side loves it. . . . I wanna keep going."

Agent Scarbro testified that, in an exchange of messages on the evening of May 2, 2018, Defendant told Ms. Barrios that police were watching him and were "on [his] a\*\*." Ms. Barrios then sent a message to Defendant that read, "Baby, I wish you didn't have to always watch and be worried about the police." At 7:08 p.m. that night, Ms. Barrios messaged Defendant and asked if he was okay. She then said, "Asia just te[x]ted me, said you out ran a lot of cops and they're waiting with automatics for you, Baby." Agent Scarbro said that there were no further messages sent through Facebook Messenger between Defendant and Ms. Barrios.

- 14 -

Agent Scarbro testified about messages sent between Defendant and Mr. Binkley through Facebook Messenger on May 2, between 10:21 and 11:00 p.m. Defendant sent Mr. Binkley a message that read, "I need your a** here." When Mr. Binkley responded that he would be home soon, Defendant replied, "I hope cause I'm bout to become a serial killer, Bro."

TBI Special Agent Russ Winkler testified that he participated in the interview of Defendant on June 29. During the interview, Defendant said that Mr. Bibian informed him that the victims were going to be killed before he and Mr. Bibian got to Pleasant Shade. Defendant said that Mr. Bibian "told him that that was the reason that they were going there to begin with." The following colloquy then occurred:

> [THE STATE]: Now this part here at the last sentence of paragraph three, "[Mr. Bibian] told me that it was a robbery." Do you see that?

> [AGENT WINKLER]: Yes.

> [THE STATE]: I believe you testified a few moments ago about the order of events, is that right?

> [AGENT WINKLER]: Yes.

> [THE STATE]: So when did [Mr. Bibian] tell [Defendant] that it was a robbery?

> [AGENT WINKLER]: All this was conversation or discussion that they had prior to even getting to Pleasant Shade.

Agent Winkler continued:

> [T]hat interview that day was conducted because up until that point [Defendant] had admitted to being present when it happened, but up to that point had maintained that he had no knowledge of it, which . . . I believed that not to be true which prompted this third interview. And as part of this third interview, what he describes is everything that happened prior to them actually getting to Pleasant Shade.

TBI Special Agent Miranda Gaddes testified that she worked as a forensic scientist in the microanalysis unit of the TBI crime lab. Agent Gaddes explained that she compared the tire tracks depicted in crime scene photographs to the red Nissan Altima and the white

Ford van.  She found that the tire tracks were inconsistent with the tire treads on both the red Nissan Altima and the white Ford van.

TBI Special Agent Heather Lenzy testified that she was a forensic scientist at the crime lab and worked in the area of serology and DNA analysis.  Agent Lenzy stated that she obtained DNA profiles for Defendant, Mr. Bibian, Mr. Smith, and Mr. Clark and compared their DNA standards to various items of evidence.  She said that she examined cigarette butts recovered from the crime scene and found a DNA profile from an unidentified male.  Agent Lenzy testified that she examined the white Ford van and found blood that belonged to Mr. Bibian.  She also examined the white Dodge Charger and found DNA belonging to Mr. Clark on the gear shift.  On cross-examination, Agent Lenzy agreed that she found no DNA evidence connecting Defendant to the crime scene.

TBI Special Agent David Hoover testified that he worked as a latent print examiner in the Nashville crime lab.  He said that he examined a .45 caliber cartridge casing found in the driver's seat of the red Nissan Altima but found no latent prints on the item.  Agent Hoover said that he processed the inside of the car and located Defendant's fingerprints on various surfaces of the car and on several items found inside the car.  He testified that, in the trunk of the car, he found a black toolbox that contained "a small weighing scale" and "a large weighing scale."  Agent Hoover found latent prints belonging to Defendant on the toolbox and on the large weighing scale.  He also found latent prints belonging to Mr. Bibian on the toolbox and on the small weighing scale.  Agent Hoover stated that he located an unspent .40 caliber bullet in the toolbox but that he recovered no useable prints from the item.  He said that he recovered a rifle and magazine from the trunk of the red Nissan Altima and examined those items for latent fingerprints but found "nothing identifiable."

Beth Sulpy testified that she previously worked as a forensic scientist in the forensic biology unit of the TBI crime lab.  Ms. Sulpy explained that, as part of her work on Defendant's case, she examined the red Nissan Altima.  She stated that presumptive tests did not indicate the presence of blood in either the cab or the trunk of the car.

TBI Special Agent Shelly M. Carman testified that she worked in the crime lab in the firearm and tool mark identification unit.  She said that she received a fired Winchester brand .40 Smith and Wesson caliber cartridge case, a Glock .40 caliber magazine, and multiple unfired .40 Smith and Wesson caliber cartridges.  Agent Carman stated, however, that she was unable to conduct any tests because investigators did not recover the suspected murder weapon.

Shawn Lafevor testified that he was a private investigator and that he interviewed Mr. Avent at the Wilson County Jail.  Mr. Avent said that he was uncomfortable about testifying against Defendant because he feared that he may be labeled a snitch in the Wilson

County Jail. Mr. Avent also said that he hoped, once his testimony was behind him, he would be able to secure a job at the jail in order to take time off his sentence.

Mr. Lafevor said that he also interviewed Mr. Boyd at the jail. Mr. Lafevor said that Mr. Boyd felt that his testimony was "the right thing to do." Mr. Boyd stated that he had recently been granted parole and he felt that he should be released from custody about a week after Defendant's trial. Mr. Lafevor asked Mr. Boyd if he felt his testimony would aid in his release from custody. Mr. Boyd stated that he was testifying "because it was the right thing to do and he was trying to do the right thing in all of his endeavors to make sure that his parole was granted." On cross-examination, Mr. Lafevor agreed that Mr. Boyd told him that he had already been granted parole.

Following deliberations, the jury found Defendant guilty as charged.

*Sentencing*

At a sentencing hearing, Tabitha Lewis of the Tennessee Department of Correction, Probation and Parole testified that she prepared Defendant's presentence report. Ms. Lewis said that she met with Defendant and that he was cooperative during her interview. Ms. Lewis stated that Defendant had one prior conviction for vandalism. She explained that, as part of her interview, she conducted the Strong R Assessment with Defendant, the results of which indicated that Defendant was a "high risk for reoffending." Ms. Lewis said that Defendant admitted that he had committed a physical assault of an adult at some point within his lifetime; that he had displayed threatening, aggressive or violent behaviors in the community; and that he had injured someone with a weapon at some point in his lifetime. She testified that Defendant admitted that his primary source of income during the last six months came from criminal behavior and that he had no legal income during his most recent six months in the community. She said that Defendant did not have a high school diploma or GED and that he indicated that he saw no need for additional education. Ms. Lewis stated that Defendant admitted that he had used criminal activity to support his drug or alcohol habit during the most recent six months in the community; that he had been less than fourteen years of age the first time he used alcohol or drugs; and that he had used both heroin and methamphetamine. She said that Defendant admitted to having a drug problem within the last six months and that he had never been clean and sober for six months or longer while in the community. Defendant also admitted to using income from selling drugs to support his drug habit during the most recent six months in the community.

Tera Baker testified that, on April 24, 2018, she was living in Smith County with her husband and two children when she had to call police to her residence. Ms. Baker explained that there had been an altercation between her young daughter and a little boy that lived next door. Ms. Baker said that she went to speak to the little boy's mother but

that the mother was not at home. Ms. Baker testified that, about thirty minutes later, Defendant knocked on her door. She stated that Defendant told her, "[Y]ou don't want to do that again, Bro. Don't come back up there, Bro." Ms. Baker testified:

> At that time, my husband came to the door to see what was going on. [Defendant] did threaten us to come off the property. I followed him up to tell him to leave. At that time [Defendant] showed his waistband and showed a gun. Threatened to kill my children and myself, so at that time, I did call the police.

Lieutenant Steve Babcock of the SCSO testified that Defendant was incarcerated in the Smith County Jail in August 2018, when an incident occurred involving Defendant. Lieutenant Babcock said that Defendant broke a light fixture and fashioned a tool that he used to carve holes in the concrete floor, the back wall, and by the plumbing in his cell. Defendant then covered the holes with toilet paper and toothpaste to make it appear that there was still concrete in the holes. Lieutenant Babcock said that, if Defendant had been successful or if more time had passed before the holes were discovered, Defendant "would have been out in the exercise yard where he had about a twelve[-]foot fence to get over. He would have been free." He stated that Defendant was charged with vandalism as a result of this conduct.

Beth Davis, the administrator for the Smith County Jail, testified that Defendant came into custody on May 3, 2018. Ms. Davis said, "When [Defendant] came into custody we ran him through NCIC and they placed an immigration hold on him due to the fact that he did not have a social security number and he was not a U.S. citizen."

Adrian Ramirez, Defendant's cousin, testified that Defendant's mother brought Defendant to this country from Mexico when Defendant was five or six years old. Defendant's mother eventually brought Defendant to Tennessee to stay with his father for a few months. Mr. Ramirez stated that Defendant's father later refused to allow Defendant to return to his mother and that a woman named Carla Rodriguez, who was living with Defendant's father, began to mistreat Defendant. Mr. Ramirez recalled a time when Defendant had scratches on his back and was "terrified to tell us that it was [Ms. Rodriguez] who did it." Mr. Ramirez stated that Defendant lived with Ms. Rodriguez for ten to twelve years. He said that, during this time, Ms. Rodriguez made Defendant do "all kinds of outside work like from cutting trees to building fences, cutting the lawn" and that Defendant was not given any money for the work. Mr. Ramirez said that he reestablished contact with Defendant in 2016. He stated:

> I brought [Defendant] to work with me, general construction, and when I left . . . I tried to bring [Defendant] with me. [Defendant] wanted to stay and

- 18 -

work with [Mr. Bibian] since he liked to do that kind of work and stuff, and he was still around his friends that he knew from childhood . . . in Smith County.

At the conclusion of the hearing, the trial court stated that it had considered the evidence presented at the trial and at the sentencing hearing, the presentence report, the principles of sentencing, the arguments made as to sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancing factors, as well as the statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee located on their website, any statements Defendant made on his own behalf, and Defendant's potential for rehabilitation or treatment.

The trial court found that Defendant was a Range I offender, noting that Defendant's prior criminal record consisted of a misdemeanor vandalism conviction. In reviewing enhancement and mitigating factors, the trial court found that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, referencing Defendant's vandalism conviction and the testimony of Ms. Baker about Defendant's showing a gun and threatening to kill her and her family. The trial court stated that Ms. Baker was a "very believable" witness and noted that she was "fighting back tears" during her testimony. The trial court stated that Defendant's behavior suggested that Defendant had "some serious issues[.]" The trial court also noted that Defendant engaged in a high-speed chase with the police when they attempted to arrest him, which the trial court characterized as "highly dangerous." The court stated, "It's just fortunate nobody got killed with respect to that incident, but that would indicate a disregard for endangering others." The court pointed to the testimony from Mr. Boyd about Defendant's threatening behavior and attempt to lure him outside while at Ms. Shaddocks' residence. The court stated that it "applied a great amount of weight to that particular enhancement factor because I think the best predictor of future performance is past behavior."

Next, the trial court considered that the offense involved more than one victim and that Defendant possessed or employed a firearm during the commission of the offense. The court found that Defendant told Mr. Boyd that he shot two people, "giving two indications with his hand[,]" and Defendant said that Mr. Bibian was too much of a coward to shoot them. The trial court additionally found that, during the commission of the felony, Defendant intentionally inflicted serious bodily injury upon another person and that Defendant's actions resulted in the death of or serious bodily injury to the victim. The court noted, however, that it was not placing much weight on this enhancement factor "that's kind of contemplated within the sentence itself[.]" The trial court also found, as an enhancement factor, that Defendant had no hesitation about committing a crime when the

risk to human life was high. Although the court found that Defendant was in the United States illegally, it stated that it would not apply any weight to the factor because Defendant entered the country as a child.

Regarding mitigating factors, the trial court considered that Defendant assisted the authorities in uncovering offenses committed by other persons by talking to the TBI and implicating Mr. Bibian. The court further found that Defendant acted under the duress and domination of another person although it was not sufficient to constitute a defense to the crime. The court stated, "I think that probably does apply. Mr. Bibian is older. Mr. Bibian is his boss. . . . [I]t appears that Mr. Bibian was kind of in control of this gentleman in some ways through his work[.]" The trial court imposed a ten-year sentence on each robbery conviction and an automatic life sentence on each first degree felony murder conviction.

Regarding the issue of consecutive sentences, the trial court found that Defendant was a dangerous offender and that his behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. In addition to the circumstances surrounding the instant offenses, the trial court considered:

> These actions of going next door and showing your gun and threatening to kill children, and ["]I would[n't] do that again, Bro,["] to a woman next door to this kid is so far beyond a range of reasonable behavior over two kids fighting and arguing. I mean, that is just taking it a hundred times further than it needs to go. I don't believe a reasonable person, even if angry, would resort to such conduct.

> This thing that was on the phone, and Mr. Boyd, and chasing through fields at night with a gun, it's like something out of a movie, and he runs into this neighbor's house. They miraculously let him in and basically may very well have saved his life. Again, that's not the behavior of someone who would have appreciation for other persons['] lives.

> We've got this high speed, high risk chase down Old Rome Pike, I believe it was. Terrifying. I'm telling you, that was just riveting. That video was something else. Who does that? I mean, that is dangerous.

> Then I weigh it on the hand of he's 18. With good behavior under Tennessee law, at least currently, a life sentence with the possibility of parole is a 60[-]year sentence. With good behavior you can get out at 51 which would put him at 69 years of age. The Strong R Assessment says he's highly likely to reoffend. . . . I'm looking at do I give an 18 year old a chance to do

something with his life at age 69 after serving at best 51 years? Do . . . I tell these family members that the loss of their loved one is not worth the sentence in and of itself? Do these two people that died together constitute one criminal sentence? I look at multiple convictions. He is a dangerous offender. His behavior does indicate little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. That behavior affected Mr. Smith and his family just as much as it did Mr. Clark and his family.

I believe based on Defendant's behavior that he is dangerous. We've got these attempts to escape within the confines of the Smith County Jail. I mean, a concerted effort to dig and to chisel and to cover it up with toothpaste and toilet paper.

. . . .

I believe that consecutive sentencing is called for. I just have enough concern about your behavior within the confines of the Tennessee statute that is called for in this case, so what I'm going to do is I'm going to run one first degree murder and two robberies, ten years apiece, all running concurrent, and consecutive to that, I'm going to assess the other life sentence with the possibility of parole[.]

Defendant filed a timely Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial, which was denied in a written order following a hearing. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the Evidence[4]

On appeal, Defendant contends that the evidence presented at trial was insufficient to support his convictions. Regarding his robbery convictions, Defendant argues that no rational trier of fact could have found that the State established the requisite mens rea, *i.e.*, that he had the intent to commit a robbery or any "real time knowledge" of a robbery. He further argues that the State failed to establish that any property was stolen from the victims and failed to show the use of fear or violence against the victims as required for a robbery

---

[4] In his brief, Defendant separates his sufficiency of the evidence argument into four different issues (Issues 1, 2, 3, and 8). However, for purposes of this opinion, we will address these issues, and Defendant's arguments in support thereof, under a single heading.

conviction. Regarding his convictions for first degree felony murder, Defendant argues that because the elements of robbery were not sufficiently proven, "[he] cannot be convicted of first degree murder." Defendant contends that the State offered no physical evidence that he exited the white Ford van during the murders and no evidence that he shot and killed the victims. Defendant asserts that the testimonies from Mr. Avent and Mr. Boyd about admissions made by Defendant after the murders were not credible. Defendant further asserts that, because of these deficiencies in proof, the trial court erred in denying his Motion for Judgment of Acquittal or, in the Alternative, Motion for New Trial.

The State responds that it presented sufficient evidence of a robbery to support the convictions for first degree felony murder and the convictions for the underlying robbery convictions. The State contends that there is ample proof in the record for a rational jury to find beyond a reasonable doubt that Defendant and his accomplice, Mr. Bibian, murdered the victims while stealing cocaine from them. The State asserts that it did not have to prove that Defendant was the shooter but "simply had to prove that he was criminally responsible for the murders and the robbery." The State further asserts that it was the province of the jury to weigh the evidence and resolve any inconsistencies and that the jury's verdict should not be disturbed on appeal.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Under Tennessee Rule of Criminal Procedure 29, a trial court "shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to

sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). Whether to grant a motion for judgment of acquittal is a question of law, and the trial court must look at the State's evidence in the light most favorable to the State and must "allow all reasonable inferences from it in the State's favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the evidence of the State," the trial court must deny the defendant's motion for judgment of acquittal. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). In ruling on a motion for judgment of acquittal, the trial court looks at the legal sufficiency of the evidence and does not weigh the evidence. *Id.* "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[,]" whether, when the evidence is viewed in the light most favorable to the State, any rational juror could have found the defendant guilty of the offense beyond a reasonable doubt. *State v. Collier*, 411 S.W.3d 886, 893-94 (Tenn. 2013). Because "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof, is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction," we will resolve both Defendant's challenge to the denial of the motion for judgment of acquittal and sufficiency of the evidence together. *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

As relevant here, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2018). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2018). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2018).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2018). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2018). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Here, the evidence presented at trial established that Defendant and his accomplice, Mr. Bibian, lured the victims to an abandoned house in a rural area of Smith County with the intent to rob the victims and that the victims were shot and killed during the robbery. Defendant and several witnesses stated that Mr. Bibian had a cocaine habit and that Mr. Bibian's relationship with the victims involved drugs. Defendant told investigators that, about three weeks before the murders, Mr. Bibian introduced him to the victims and told him that the two men sold cocaine. Mr. Avent testified that he saw Mr. Bibian speaking to the victims about picking up or dropping off drugs. Then, days before the murders, Defendant told Mr. Boyd that he was going to do a "lick" or robbery for Mr. Bibian.

The State introduced evidence that Defendant sent several Facebook Messenger messages to his girlfriend, Ms. Barrios, in the hours before the murders. In those messages, Defendant told Ms. Barrios that he was going on a dangerous "mission" that was in some way related to how he made his money. The State also introduced evidence that Mr. Clark told his girlfriend that he and Mr. Smith were going to "pick[] up money from somebody." The proof then showed that Mr. Bibian and Mr. Smith exchanged multiple phone calls and text messages as they made their way to the abandoned house on Dillehay Hollow Road, and Defendant told investigators that he knew someone was coming out to the house with cocaine for Mr. Bibian.

Defendant also told investigators that he drove Mr. Bibian's white Ford van to the location and backed the van into the driveway up next to the house. Defendant said that, once the victims arrived, Mr. Bibian shot both victims. Defendant told investigators that Mr. Bibian had a pearl handled .40 caliber Glock on him. He said that Mr. Bibian got back into the van with a backpack the size of a lunch box that had cocaine in it. Defendant said that he drove the van away from the scene. After the deputy discovered the victims, the medical examiner conducted autopsies and found that the victims died as a result of gunshot wounds, that Mr. Smith was shot in the head, and that Mr. Clark was shot in the neck. Investigators testified that, although cash remained on the victims, neither of the victims were found with any cocaine.

Additionally, the evidence showed that Defendant began spending a large amount of money immediately after the murders, supporting an inference that he had recently

obtained something of significant value. *See e.g., State v. Jason R. Garner*, No. W1999-01679-CCA-R3-CD, 2003 WL 1193253, at *4 (Tenn. Crim. App. Mar. 14, 2003) (finding sufficient evidence to support an especially aggravated robbery conviction, in part because "[i]t was established that the Appellant went on a spending spree with the money a very short time after the incident ending [the victim's] life"), *perm. app. denied* (Tenn. Oct. 6, 2003). Defendant threw a sack of money on Ms. Shaddocks' bed after the murders. He also fixed some damage on his car, spent $1400 on new rims for his car, wore new clothes and got a haircut, and promised to "spoil" Ms. Barrios.

In the days after the murders, Defendant also sent numerous messages to Ms. Barrios reflecting consciousness of guilt about a weighty event that he felt had "changed" him, made him "so cold," and excited his "dark side." Defendant admitted to Mr. Avent that he was involved in the victims' deaths, and he told Mr. Boyd that he shot and killed the victims because Mr. Bibian was "too scared" to do it. Defendant also told Mr. Binkley that he was "about to become a serial killer" in a Facebook Messenger message sent on the same night that Defendant brandished a pearl handled pistol and chased Mr. Boyd through a field after telling Mr. Boyd about the murders.

Finally, the State presented evidence that Defendant was hiding from police following the murders and that he fled when law enforcement attempted a traffic stop. He led police on a dangerous high-speed chase, escaped into the woods, and was found hiding in a house the following day. *See Dorantes*, 331 S.W.3d at 388 (quoting *State v. Zagorski,* 701 S.W.2d 808, 813 (Tenn. 1985)) ("'[F]light and attempts to evade arrest are relevant as circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt.'"). When viewed in the light most favorable to the State, the evidence was sufficient to show that Defendant, along with Mr. Bibian, intended to rob the victims, that they took the victims' cocaine by violence, and that the victims were killed in the process.

Defendant contends that his admission to investigators that Mr. Bibian told him "it was a robbery" was ambiguous as to whether Mr. Bibian made the statement before or after the murders. However, Agent Winkler testified that, during his interview, Defendant made the statement in the context of discussing what Defendant knew before the murders. Additionally, Mr. Boyd testified that Defendant told him before the murders that he was going to do a robbery for Mr. Bibian. Defendant also contends that there was insufficient evidence that he "actually shot and killed the victims" or that he "ever exited the vehicle and stepped foot on the property." However, Mr. Boyd testified that Defendant admitted being the killer, demonstrating to Mr. Boyd how he shot the victims, and saying that Mr. Bibian was too scared to do it. In any event, the State did not have to prove that Defendant shot the victims himself because, under the theory of criminal responsibility, it was sufficient for the State to prove that Defendant knew that there was going to be a robbery

and that Defendant intended to participate in it by driving the van for Mr. Bibian. *See State v. Winters*, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003). Affording the State the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom, we conclude that the evidence presented was sufficient to support Defendant's convictions for two counts of first degree felony murder and two counts of robbery. Defendant is not entitled to relief.

### B. Facebook Messenger Messages

Defendant asserts that the trial court erred in admitting the Facebook Messenger messages. Defendant first asserts that the State failed to the verify that "the messages really were exchanged between [] Defendant's account and that of [Ms.] Barrios[.]" Defendant argues that the time stamps on the messages were hearsay and that the State failed to present a witness from Facebook to "testify to the veracity of the time[ ]stamps[.]" He also argues that the Facebook Messenger messages contained hearsay within hearsay. Finally, Defendant contends that the admission of the messages violated his constitutional right to confront Ms. Barrios and the Facebook employee who provided the affidavit authenticating the messages.

The State responds that the trial court properly admitted Defendant's Facebook Messenger messages as proof of his guilt. The State argues that the record shows the messages were properly authenticated as those purportedly sent by Defendant and that they were admissible pursuant to the hearsay exception for business records. The State also asserts that Defendant waived his claim under the Confrontation Clause by failing to raise it in the trial court.

### a. Authenticity

Evidence must be authenticated to be admissible. *See* Tenn. R. Evid. 901(a). The requirement for authentication "is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." *Id.* One method of authentication is "[t]estimony that a matter is what it is claimed to be" by a witness with personal knowledge. Tenn. R. Evid. 901(b)(1). Another method is by the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics" of the evidence proffered when "taken in conjunction with circumstances" of the case. Tenn. R. Evid. 901(b)(4). Whether evidence has been sufficiently authenticated is within the trial court's sound discretion, and its decision will not be overturned absent an abuse of discretion. *See Mickens*, 123 S.W.3d at 376.

In this case, Agent Scarbro testified that he obtained Defendant's Facebook Messenger records through a search warrant for Defendant's Facebook account. Agent

Scarbro stated that Facebook authenticated the records as coming from Defendant's account, and he identified a copy of the Certificate of Authenticity of Domestic Records of Regularly Conducted Activity, which was admitted as an exhibit to his testimony.[5] The records from Facebook show that the name on the targeted account was "Alain Benitez." Moreover, most of the messages were sent to or received from an account displaying the name of Defendant's girlfriend, "Ana Barrios," while a few other messages were sent to an account in the name of Defendant's friend, "Jonathon Binkley." The State relied on the "distinctive characteristics" of the Facebook account and the messages. Tenn. R. Evid. 901(b)(4). Not only did the targeted account bear Defendant's name, but the substantive content of the messages contained numerous details relating to Defendant's life. As such, the jury could have reasonably accepted that the messages were what the proponent claimed, *i.e.*, messages from Defendant's Facebook account, and the trial court did not abuse its discretion in finding that the evidence was sufficiently authenticated. Tenn. R. Evid. 901(a); *see State v. Ferguson*, 741 S.W.2d 125, 127 (Tenn. 1987) (stating that "the circumstances must only show with reasonable assurance the identity of the evidence"). Defendant is not entitled to relief.

## b. Hearsay

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). Thus, a statement offered for some purpose other than establishing that what the declarant said is what truly occurred is not hearsay. *See Pylant v. State*, 263 S.W.3d 854, 870-71 (Tenn. 2008). The Tennessee Rules of Evidence prohibit the admission of hearsay unless authorized by an exception to the rule. Tenn. R. Evid. 802. One of those exceptions is for "[r]ecords of [r]egularly [c]onducted [a]ctivity." Tenn. R. Evid. 803(6). That exception applies to "[a] memorandum, report, record, or data compilation, in any form, of acts [or] events . . . made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation . . . ." *Id.* In lieu of in-court testimony, the business record may be introduced through a self-authenticating affidavit by a "custodian or other qualified person" if that person certifies that the record was: (1) "made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters," (2) "kept in the course of the regularly conducted activity," and (3) "made by the regularly conducted activity as a regular practice." Tenn. R. Evid. 902(11)(A)-(C); *see* Tenn. R. Evid. 803(6) (incorporating Rule

---

[5] The record reflects that the State gave pre-trial notice of its intent to rely upon a self-authenticating affidavit as required by Rule 902 of the Tennessee Rules of Evidence, and Defendant does not argue on appeal that he had inadequate notice under the rule.

902(11) by reference). "Hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." Tenn. R. Evid. 805. Whether a statement constitutes hearsay and whether it satisfies an exception to the hearsay rule are questions of law, which are reviewed de novo on appeal. *State v. Kendrick*, 454 S.W.3d 450, 479 (Tenn. 2015).

As required by Rule 902 of the Tennessee Rules of Evidence, the State introduced a self-authenticating affidavit from the custodian of records for Facebook. *See* Tenn. R. Evid. 902. In the affidavit, the custodian certified that "[t]he records were made at or near the time the information was transmitted by the Facebook user" and that the records "were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook." The affidavit also stated that the records for the targeted account were "saved in electronic format after searching Facebook's automated systems[.]" The certification was sufficient to satisfy the requirement for the business records hearsay exception. *See* Tenn. R. Evid. 803(6); Tenn. R. Evid. 902(11)(A)-(C).

Moreover, despite Defendant's argument to the contrary, the custodian's affidavit authenticated the time stamps. The time stamps were part of the business records, and the records custodian certified the accuracy of those records in the affidavit. Additionally, we agree with the State that an expert was not required to explain the time zone differences between the Facebook records and the time in the Central Time Zone and that the trial court could take judicial notice of the required calculation. *See e.g., State v. Ronnell Barclay*, No. W2017-01329-CCA-R3-CD, 2019 WL 994181, at *7 n.4 (Tenn. Crim. App. Feb. 28, 2019) (taking judicial notice "that Universal Coordinated Time (UTC) is six hours ahead of the North American Central Time Zone (CT)"), *perm. app. denied* (Tenn. July 19, 2019).

Regarding the substantive content of the Facebook records, the hearsay exception for party-opponent admissions applies to messages sent by Defendant. Tenn. R. Evid. 803(1.2); *see State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007). Moreover, the trial court properly determined that the messages sent from Ms. Barrios and Mr. Binkley were not hearsay because they were not offered for the truth of the matter asserted but to put Defendant's messages into context. *See* Tenn. R. Evid. 801(c); *State v. Joshua Hill-Williams*, No. W2015-01743-CCA-R3-CD, 2017 WL 1907735, at *12 (Tenn. Crim. App. May 9, 2017) (concluding that text messages received by the defendant were not hearsay when offered to put the defendant's own messages "into context"), *perm. app. denied* (Tenn. Aug. 18, 2017). The State did not offer the messages from Ms. Barrios and Mr. Binkley for their truth but because Defendant's messages would have been nonsensical without the context of the other half of the conversations. Defendant is not entitled to relief on this claim.

### c. Right to Confrontation

We note that Defendant failed to raise his Confrontation Clause claim in his motion for new trial and, instead, raised the claim for the first time on appeal. Tennessee Rule of Appellate Procedure 3(e), provides, in pertinent part, that:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

*See also State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). Thus, we conclude that the claim is waived. Moreover, Defendant has not requested plain error review. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) (stating that the defendant bears the burden of persuading the appellate court that the trial court committed plain error). Defendant is not entitled to relief.

### C. Admission of Inconclusive Forensic Evidence

Defendant contends that the trial court erred by admitting "a large amount of mostly inconclusive forensic evidence" that was "misleading, irrelevant, and inappropriate" and served as only "a waste of time and source of confusion for the jury." The State responds that Defendant has waived the issue.

In his brief, Defendant does not specifically identify what "inconclusive forensic evidence" he is challenging on appeal. Defendant provides no citation to the record in this section of his brief, and he cites to no applicable legal authority. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Crim. Ct. App. 10(b). "[I]t is not the duty of this court to scour the record in search of the facts supporting a defendant's argument." *State v. Sharod Winford Moore*, No. M2015-00663-CCA-R3-CD, 2016 WL 3610438, at *8 (Tenn. Crim. App. June 28, 2016), *perm. app. denied* (Tenn. Nov. 17, 2016). By failing to support his argument with proper references to the record and citation to authorities, Defendant has waived our consideration of this issue.

Additionally, our review of the record has failed to show that Defendant raised contemporaneous objections to the admission of evidence based upon its inconclusive

nature. By failing to raise contemporaneous objections, Defendant has likewise waived our consideration of the issue. *See* Tenn. R. App. P. 36(a) (providing that appellate courts need not grant relief when the objecting party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Waiver notwithstanding, the record reflects that Defendant thoroughly cross-examined TBI agents who testified about their examination and testing of various pieces of forensic evidence. Defendant used these opportunities to repeatedly point out to the jury that no physical evidence connected him to the crime scene, which supported his claim that Mr. Bibian shot and killed the victims. Thus, it appears that the forensic evidence was relevant as it had the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Tenn. R. Evid. 401, and that the probative value of the evidence was not substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403. Defendant is not entitled to relief.

## *D. Sentencing*

Defendant asserts that the trial court abused its discretion when it imposed consecutive life sentences. He argues that, because he was eighteen years old at the time of the offenses, he lacked substantial judgment in his participation in the crime and that he acted under the direction and influence of his older, more experienced accomplice, Mr. Bibian.

In response, the State acknowledges that the trial court failed to make the requisite *Wilkerson* findings when imposing consecutive sentences based upon the dangerous offender factor found in Tennessee Code Annotated section 40-35-114(b)(4). The State asserts, however, that this court should conduct an independent review of the record and affirm consecutive sentencing because the record readily demonstrates that Defendant is a dangerous offender. Alternatively, the State requests that the court remand the case to the trial court for further consideration of the *Wilkerson* factors.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2018); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2020).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2020); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

The Tennessee Supreme Court has held that the *Bise* standard applies to consecutive sentencing determinations "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds" for discretionary consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). A trial court "may order sentences to run consecutively" if it finds that the defendant is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4) (2020); *see Wilkerson*, 905 S.W.2d at 936. Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). "The mere recitation of the *Wilkerson* factors is not a substitute for the requirement of making specific findings." *State v. Prentice C. Calloway*, No. M2004-01118-CCA-R3-CD, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005), *no perm. app. filed.*

In this case, the trial court failed to adequately provide reasons on the record to support the imposition of consecutive life sentences. In imposing consecutive sentences, the trial court relied upon the dangerous offender factor under Tennessee Code Annotated

section 40-35-114(b)(4) but failed to consider the two additional *Wilkerson* factors and whether the proof supported their presence. The trial court's statement that Defendant's behavior indicated little or no regard for human life and that Defendant had no hesitation about committing a crime in which the risk to human life was high is insufficient and does not demonstrate that the imposition of consecutive sentences reasonably relates to the severity of the offenses or that the total sentence is necessary to protect the public from Defendant. *See Wilkerson*, 905 S.W.2d at 939. Because the trial court failed to provide adequate reasons on the record for imposing consecutive sentences, this court cannot presume that consecutive sentences are reasonable nor defer to the trial court's exercise of discretion.

In *Pollard*, our supreme court explained that, when faced with this situation, appellate courts have two options: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432 S.W.3d at 864 (citing *Bise*, 380 S.W.3d at 705 & n. 41). In this case, "because the considerations required under *Wilkerson* involve a fact-intensive inquiry" we conclude that "the better course is to remand to the trial court for consideration of the *Wilkerson* requirements in determining the propriety of consecutive sentencing." *Id.*

### III. Conclusion

For the aforementioned reasons, we affirm Defendant's convictions but reverse the trial court's imposition of consecutive sentencing and remand the cause to the trial court for a new sentencing hearing. The new sentencing hearing is limited to consideration of the factors outlined in *Wilkerson* to determine the propriety of consecutive sentencing in this case.

_____
ROBERT L. HOLLOWAY, JR., JUDGE